75550. CARROLLTON COCA-COLA BOTTLING COMPANY
et al. v. BROWN.
(365 SE2d 143)

BIRDSONG, Chief Judge.

This is a workers' compensation discretionary appeal arising out of the employer's requests for change of physicians, for suspension of benefits for failure of claimant to cooperate with rehabilitation and for termination of benefits based on claimant's "change of condition."

The claimant Terry Brown, while a route salesman with Coca-Cola Bottling Company of Carrollton, suffered a ruptured disk in 1978 at age 28 while lifting a Coca-Cola crate. He has had four back operations, three of them deemed unsuccessful. He has experienced increasing pain, unrelieved except by use of narcotic painkillers. His mental health has deteriorated so that his orthopedic physician, Dr. Benton, referred him to a psychiatrist, Dr. Carter. In Dr. Carter's care, Brown has been hospitalized 20 times for severe depression and "nerve problems" caused by constant pain and the psychological effects of his inability to work.

In 1984, a fifth, highly dangerous "last resort" operation was recommended. This operation is attempted only in "life and death" situations; it does not promise success. Viewing this operation as ill-advised, and seeing the claimant's physical and emotional condition steadily worsen while his consumption of drugs increased, apparently

to the point that he injects them into himself, the employer requested a rehabilitation conference. The ALJ appointed a rehabilitation supplier, Nurse Sullivan. She proposed as an alternative to surgery that the claimant attend the Miami Pain Clinic, and secured his admission. This clinic provides a controversial but highly successful regimen that involves "fighting through the pain." It is not clear, though, that Brown's apparent drug dependency was fully taken into consideration in these plans, since evidently it was not considered a significant problem by his own physicians. It is also not indicated that the claimant was fully prepared for, or even clearly aware of, the fact that the clinic plans involved detoxification.

Claimant and his wife arrived in Miami in February 1985 for 3 days of evaluation prior to treatment. The clinic head, Dr. Rosomoff, assessed Brown as a "sensitive inhibited individual who is easily upset." On the first day of treatment, hospital personnel took all his medications away. Although later the clinic physicians denied having taken his medications away, Dr. Rosomoff's own discharge summary states clearly that after the evaluation period, Brown was "placed on Percocet, p.o., to begin detoxification. However, this may not have been strong enough to control the withdrawal."

The claimant testified that at his first physical therapy encounter, the therapist commenced to pull and bend his leg with such enthusiasm that "I thought I was about out of my head." He begged her to stop but she said, "No pain; no gain," and continued her ministrations. Finally, he said, "I'm sorry, I can't take the pain," and she said, "Well then leave." So he did. The discharge summary states that when he left ("against medical advice"), he was undergoing "severe drug addiction withdrawal." Nurse Sullivan testified that she "doubt[ed]" the therapist would have done exercises and manipulations that would have been painful; yet she stated contradictively that the express goal of the regimen was to teach the patient to increase his pain threshold and tolerate pain.

The claimant returned to Atlanta in a very nervous, depressed and angry condition. He feared he would commit suicide. Dr. Carter readmitted him to the hospital psychiatric unit. Thereafter he forbade Nurse Sullivan to see Brown because he deemed her contacts counterproductive to all his progress in stabilizing Brown's nerves and depression; furthermore, Brown no longer trusted her. Dr. Carter concluded Brown was not psychologically capable of dealing with the clinic program at that time.

At this stalemate, the employer/insurer made its formal requests and a hearing was held. The ALJ granted the request for change of the psychiatrist (Dr. Carter) but denied a change of the orthopedist, Dr. Benton, and retained Nurse Sullivan as rehabilitation supplier. He found that "because of the complexities of this case the failures of

the claimant [to comply with the rehabilitation directives] are a direct result of dependency to drugs prescribed by the treating psychiatrist . . . ," and the motion to suspend benefits was denied.

On appeal, the board ordered an independent psychiatric evaluation by Dr. Mercer (who it had been proposed would replace Carter). Dr. Mercer was specifically to address the question of Brown's chemical dependency and manipulative behavior. He found Brown to be of suicidal risk and suffering from chronic pain syndrome, and recommended he be treated for his chemical dependency in a drug rehabilitation unit.

Thereupon, the board affirmed the ALJ's order, except to deny the change of psychiatrist from Carter to another, finding that "it is unwise to disturb claimant's standing relationship with [Carter] and [Benton]." The board suspended rehabilitation efforts indefinitely, but directed Drs. Benton and Carter to "immediately undertake an interdisciplinary approach to effectively treat claimant's drug dependency (if any) and psychological problems."

The superior court found evidence supporting the board's award and affirmed it. The employer/insurer appeals to us. *Held*:

1. We have stated the evidence as it favors the award (see *Lockhart v. Liberty Mut. Ins. Co.*, 141 Ga. App. 476 (233 SE2d 810)) and find that there is evidence to support it *on the narrowly confined issues of change of physician and failure to cooperate with rehabilitation.* See *Galmon v. Seabreeze Mfg. Co.*, 181 Ga. App. 132, 133 (351 SE2d 521). We find further that while opinions may differ as to the most judicious way to resolve the difficult problems of this case, the board's award was not so patently whimsical, arbitrary, capricious and unrestrained to constitute an abuse of discretion under *Columbus Foundries v. Moore*, 175 Ga. App. 387 (333 SE2d 212). The decision in *Columbus Foundries* can be explained by reference to OCGA § 34-9-105 (c) (4); a charge of abuse of discretion must be sparingly made and such abuse will rarely be found unless the award is so far outside the evidence as to be defective under § 34-9-105 (c). It is not so in this case. The board clearly acted carefully and within the evidence and effected a judicious compromise by retaining Brown's present physicians but directing them to treat his chemical dependency before further effort is made to rehabilitate.

The appellants contend some of the claimant's own testimony is self-contradictory, which fact demands a ruling against him under *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (343 SE2d 680). This contention is a perversion of what *Prophecy Corp.* says. Clearly the law does not require a ruling be entered against a party who makes an arguable self-contradiction on a single or minor point amidst a sea of favorable evidence.

*Prophecy Corp.* involved summary judgment proceedings, and

pointed out as a basis (p. 28) that at a trial, where the favorable portion of a party's self-contradictory testimony is *the only evidence* of his right to recover or of his defense, the opposing party is entitled to a directed verdict. Therefore, on summary judgment if the party contradicted himself *on the dispositive issue of the case*, this testimony is construed against him. *Prophecy Corp.* held that even so, the trial court may determine that such a contradiction is "reasonably explained," and in any case the rule applies only to direct contradictions, not vague or equivocal testimony. The contradictions which appellants have strained to find in the claimant's medical testimony are not direct unequivocal testimony on the dispositive issue of the case nor do they constitute the only evidence in claimant's favor. Some of these "self-contradictions" (e.g., the assertion that claimant has in fact refused the fifth operation while seeking to retain the physician (Benton) who advocates it; and is seeking to retain the physicians who have fostered his chemical dependency while claiming he is unable to undergo rehabilitation which fact he arguably admits is due to his drug addiction), are so subjectively equivocal and unclear that they do not constitute self-contradictions of the only evidence in claimant's favor, so much as they show claimant's floundering confusion in a complex case. This straining at gnats has contributed mightily to the clouding of the salient issue in the case, as shown below.

2. We reverse the superior court's affirmance of the board's award, because the forums below erroneously failed to consider a salient issue which might have affected all issues. This issue was the request for a suspension of benefits based upon a change of condition of claimant's status, economically and physically. The employer/insurer contends the superior court erred "in failing to reverse the [board] in denying that appellee had undergone a change of condition for the better." This assertion misstates the case. The fact is the board did not rule on the issue at all.

Claimant's evidence showed he is totally unable to work, must use a cane, and spends most of his time in bed or in a chair at home, unable to do even yardwork or housework. The employer/insurer at the ALJ's hearing produced an investigator, Keaton, who testified he surveilled the claimant for three days in his hometown of Heflin, Alabama, mostly at a rental house undergoing renovation. He testified he saw the claimant drive up, walk into the house without aid of his cane, and move about in and outside the house with no sign of physical disability whatever for several hours. Sounds of hammering and sawing emanated from the house. A siding crew arrived and were directed in by Brown. Obviously Keaton could not see inside the house but often Brown was seen going by a window evidently carrying something. Keaton saw Brown come out on the porch and wipe sweat from his face; Keaton also saw him bend and stoop without any sign of

disability and favoring no part of his body. He testified the only time he had seen Brown limp was on the occasion of this hearing. Once Brown was seen taking trash and debris outside the rental house, and once he came outside carrying a board about two by eight inches thick and ten feet long. Keaton positively identified Brown as the man he had seen at the house. Another time Brown and his wife arrived in a truck with Brown driving. The house had two front doors, evidently for apartments. Mrs. Brown went in one door and Brown went in the other, and for several hours it seemed a great deal went on inside involving wallpapering. Keaton also saw Brown come out and wash paint brushes.

The investigator testified it was difficult to surveil in this town for it was a close knit neighborhood with elderly people moving about in their yards. Nevertheless, Keaton produced photographs of a person he positively identified as the claimant, who was sitting before him at the hearing. The depictee was seen dimly in the truck but somewhat more clearly outside the house, standing and stooping and bending. Mr. Keaton excused the graininess of some of the photos by saying he had been in the shade and in a difficult perspective surveillance-wise. Later the claimant contended one picture showed only the rear view of a man bending over; but at least one of the photos presents a nice three-quarter view of the man's face, perfectly detectable as a unique and identifiable physiognomy.

The claimant earned $220 per week when he was injured and his wife at one time worked at a factory. Evidently they had no other source of income, and they rented a house to live in. Now they own the house they live in except for a mortgage, and own free and clear four other rental properties, some containing apartments. Keaton's pictures of these houses show them to be attractive, particularly the Browns' residence, a large two-story white house with small box columns reaching to the roof. Their income from workers' compensation and Social Security benefits amounts to over $20,000 tax-free per year and in addition to this they have $1,175 per month from rental of these other properties. Keaton also testified that Brown is known in his hometown as a contractor in the house-remodeling business. In evidence is a zoning change petition signed by several town residents requesting a change be granted "to Mr. Terry Brown for the conversion of [a single dwelling to a duplex]."

The claimant dismissed all this as "irrelevant to the issues," but the ALJ said he would let it in as impeachment. There was no testimony or evidence that the person depicted in the photographs was not Mr. Brown. Neither the pictures depicting Mr. Brown nor the pictures showing the houses are directly disputed. If they are true depictions, they directly contradict Brown's evidence that he is unable to walk, uses a cane, and is able only to sit and occasionally move about

with great difficulty. Mrs. Brown said the man in the picture could not be her husband because she thought he was in the hospital one of those days. She said he might have gone over to that house one day just to look around, but that he never spent the whole day there because he is unable to work and mostly sits around the house and watches television. Both claimant and Mrs. Brown testified all these houses belong to her and that she saw to all the renovations and Mr. Brown had nothing to do with it. She testified, as to her present income, that she directs beauty pageants.

The claimant's counsel characterized all of this evidence as irrelevant, "nit-picking," and "all cotton candy," and evidently so did the ALJ and the board and superior court, for none of these bodies mentioned it except the superior court in mere passing reference to the issues raised. Although the board did not include the photographs in the record forwarded to the superior court, the investigator's testimony was in the record, and was ignored in the superior court's review. On every level, appellants have raised this evidence; each time the claimant has dismissed it as vague, irrelevant and proving nothing, each time it was ignored; and each time the employer has stubbornly raised the evidence up again, but apparently without any real conviction that it represents its own central issue and that the board erred in failing to rule *on that issue.*

On appeal we find it insupportable that this issue of change of condition should have been ignored completely, along with the evidence supporting it. The reason for this seems to be first that the evidence keeps getting confused by everybody as merely going to refute the requests to change physicians and to suspend benefits for failure to cooperate with rehabilitation. Furthermore, the claimant is a witness so credible and found credible by so many professionals, and it seems so obvious no well person would endure four back operations and contemplate yet another that may as a side effect leave him impotent and still not cure his pain, that the evidence offered that he is working, or able to work, is apparently deemed preposterous. It must have been supposed there are only two alternatives, that he is either able or disabled, each precluding the other; and since he so obviously seems to be disabled, the evidence that he is able was deemed absolutely weightless.

In this the ALJ, board, and superior court erred. The issue of change of condition is a salient issue in the case. It demands a ruling, even if only to say the entirety of this evidence was found unworthy and to deny there had been a change. This evidence and its serious implications are not limited in value to impeachment on other issues, but are direct evidence going to a principal issue.

In view of the discomfort below in dealing with this evidence and issue, we are compelled to say we do not find this evidence to be irrec-

oncilable with the conclusions posed by the rest of the evidence in the case. *If the facts show he is able to work and to some particular degree is working,* such facts must be addressed. Although we state no opinion of the case, we venture to say there are as many possibilities and complex varieties in human behavior as there are humans, and the resolution of this case may lie in a possibility or view not yet considered because all the evidence was not considered.

OCGA § 34-9-102 (f) provides that upon a hearing the administrative law judge *"shall determine the questions and issues* and file the decision with the record of the hearing." (Emphasis supplied.) The findings of fact must address themselves to the specific facts and the material issues raised. *Carrie v. Continental Ins. Co.,* 147 Ga. App. 544 (249 SE2d 349). The award of the board must state the facts it finds true so that the losing party may intelligently prepare his appeal and the cause may be intelligently reviewed. Id. The findings of fact must be concise but comprehensive as found to be true by the board (or ALJ), upon any material issues of the case. *Noles v. Aragon Mills,* 110 Ga. App. 374, 375 (138 SE2d 598).

If the findings of fact are incomplete and fail to consider and adjudge all the evidence in the case, they are, as stated, in effect insufficient to support the award under the standard of review of § 34-9-105 (c) (3) and (4). See *Grier v. Travelers Ins. Co.,* 112 Ga. App. 159, 160 (144 SE2d 196).

Moreover, to the extent such evidence and issue of change of condition, if considered, might have affected the determination on the other issues (change of physicians and cessation of benefits for failure to cooperate with rehabilitation), the facts found as to *those issues* are insufficient and incomplete. See *United States Fire Ins. Co. v. Phillips,* 120 Ga. App. 51, 53 (169 SE2d 665).

On an earlier occasion, we said that the board's failure to make an affirmative finding of fact as to a matter was tantamount to finding that no such fact existed (*Anderson v. Houston Fire &c. Ins. Co.,* 104 Ga. App. 680 (122 SE2d 589)), but that is only where all the evidence is undisputed and demands that certain finding. *Gatrell v. Employer Mut. &c. Ins. Co.,* 121 Ga. App. 467, 468 (174 SE2d 237); *Dudley v. Sears, Roebuck & Co.,* 111 Ga. App. 214, 216 (141 SE2d 179). That certainly is not the case here.

We find that the board's failure to consider and weigh the evidence as to change of condition, and failure to consider it as it might affect the other issues in the case, were error. Therefore the superior court erred in affirming the award. Under authority of *Travelers Ins. Co. v. Merritt,* 124 Ga. App. 42, 44 (183 SE2d 73), we reverse the decision of the superior court as to all issues, with direction that the case be remanded for reconsideration by the board on the merits of every issue in light of the evidence on change of condition, including

the receipt of such additional evidence as may be necessary for a complete resolution of the issues. The board is to be directed to render a complete finding of fact, disposing of every issue raised.

*Judgment reversed and case remanded. Deen, P. J., and Pope, J., concur.*

DECIDED JANUARY 19, 1988.

Mark S. Gannon, Richard G. Farnsworth, for appellants.
E. Lamar Gammage, Jr., George E. Mundy, for appellee.